Argued April 22, reargued November 10, affirmed
November 24, 1954

# FEDERAL CARTRIDGE CORPORATION *v.* HELSTROM

276 P2d 720

*Cleveland C. Cory,* of Portland, argued the cause for appellant. With him on the briefs were Hugh L. Biggs, and Hart, Spencer, McCulloch, Rockwood & Davies, all of Portland.

*Bartlett F. Cole* and *R. R. Bullivant,* of Portland, argued the cause and filed briefs for respondent.

Herman T. Van Mell, of Chicago; Stanley A. Weigel, of San Francisco; and Nicholas Jaureguy, of Portland; filed a brief for Sunbeam Corporation as amici curiae, urging reversal.

TOOZE, J.

This is a suit for an injunction and for damages, brought by plaintiff Federal Cartridge Corporation against Henning Helstrom, dba Foster Sporting Goods, as defendant. Decree was entered in favor of defendant, and plaintiff appeals.

Plaintiff is the manufacturer of certain shotgun shells which are sold in the state of Oregon and elsewhere, and which bear plaintiff's exclusive registered trademarks and brand names of "Hi-Power" and "Monark". Acting pursuant to the provisions of §§ 43-401 to 43-404, incl., OCLA (ORS 646.310 to 646.370, incl.), commonly known as the "Fair Trade Law", plaintiff entered into written agreements with wholesalers and retailers in and about the city of Portland and elsewhere in Oregon. All agreements were in form and substance the same. One of such agreements is that entered into between plaintiff and one Semler, of Portland, Oregon, on February 17, 1950, whereby Semler agreed not to advertise, offer for sale or sell any of plaintiff's products in any state having a Fair Trade Act "at less than the applicable Minimum Resale Price then in effect for the Product

advertised, offered for sale, or sold.'' Under said contracts, minimum retail prices at which such shotgun shells might be sold were stipulated.

On March 17, 1952, defendant, a merchant of Portland, Oregon, purchased at Tacoma, Washington, a large supply of such shotgun shells for the purposes of resale at retail within the state of Oregon. Defendant never entered into any contract with plaintiff; in other words, he is a nonsigner. During the year 1952, both prior to and following the filing of the complaint in this suit (October 17, 1952), defendant advertised, offered for sale, and sold such shotgun shells at retail for less than the stipulated minimum retail prices established under said contracts. Prior to the commencement of this suit, plaintiff gave notice to defendant of the existence of its Oregon Fair Trade agreements and the stipulated resale prices thereunder.

In its complaint plaintiff prayed for injunctive relief against the actions of defendant, and for damages for sales made by defendant subsequent to July 14, 1952.

July 14, 1952, marks the date of the enactment by Congress of the Federal Fair Trade Act (McGuire Act): 66 Stat 632, 15 USCA 10, § 45, as amended.

The principal question for decision on this appeal is whether a nonsigner of the fair trade agreements entered into by plaintiff, who knowingly advertises and sells a fair-traded commodity may claim an absolute immunity from sanctions of the Oregon Fair Trade Law because the commodity which is sold in interstate commerce was purchased by him for purposes of resale prior to the date of the enactment of the McGuire Act, supra.

Section 43-401, so far as material to the problem before us, reads as follows:

"No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears or the vending equipment through which such commodity is sold bears, the trademark, brand or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the state of Oregon by reason of any of the following provisions which may be contained in such contract:

"(1) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.

"(2) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

"(3) That the seller will not sell such commodity:

"(a) To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"(b) To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price."

Section 43-402, OCLA, provides:

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pur-

suant to the provisions of section 43-401 *whether the person so advertising, offering for sale or selling is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby." (Italics ours.)

Oregon's Fair Trade Law was adopted pursuant to the authority attempted to be conferred by Congress in the adoption by it of the Miller-Tydings Amendment to the Sherman Antitrust Act of July 2, 1890: 50 Stat 693, 15 USCA 4, § 1.

Based upon the decision of the United States Supreme Court in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 US 183, 81 L ed 109, 57 SC 139, 106 ALR 1476, we held the Fair Trade Law of this state to be constitutional: *The Borden Co. v. Schreder,* 182 Or 34, 37, 185 P2d 581.

In 1951 the United States Supreme Court again considered a state fair trade act as it applied to nonsigners of fair trade agreements: *Schwegmann Bros. v. Calvert Corp.,* 341 US 384, 93 L ed 1002, 71 SC 762.

In that case Mr. Justice Douglas, speaking for the majority of the court, said (341 US 389):

"It should be noted in this connection that the Miller-Tydings Act expressly continues the prohibitions of the Sherman Act against 'horizontal' price fixing by those in competition with each other at the same functional level. Therefore, when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids. See Parker v. Brown, 317 U.S. 341, 350. Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual 'vertical' agreements with all his retailers. But when retailers are *forced* to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price

fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to *voluntary* engagements.''

As to nonsigners, the Supreme Court held that the provisions of the fair trade law of Louisiana which sought to bind them to the fair trade agreements were invalid.

In 1951 the validity of Oregon's Fair Trade Law, as applied to nonsigners, came before this court for decision. In *Lambert Pharmacal Co. v. Roberts Bros.,* 192 Or 23, 233 P2d 258, we held, on the authority of the Schwegmann case, that plaintiff's price resale maintenance activities were illegal per se, as being in violation of the provisions of the Sherman Antitrust Act. In discussing the effect of the Schwegmann case, Mr. Justice LUSK, in speaking for the court, said (at page 27 of 192 Or):

"On May 21, 1951, * * * the Supreme Court of the United States in Schwegmann Brothers v. Calvert Distillers Corp. and Schwegmann Brothers v. Seagram Distillers Corp., 341 U.S. 384, 71 S. Ct. 745, 95 L. ed. 1035, held, three judges dissenting, that this was a misconception; that the Miller-Tydings Amendment only removed the taint of illegality from *contracts* or *agreements* prescribing minimum resale prices, not from efforts to force nonsigners to observe such prices; and that an attempt of two distributors of whiskey and gin to compel by injunction a New Orleans retailer, a nonsigner, to sell their products at not less than the minimum resale prices must fail because resale price maintenance by notice is a violation of the Sherman Act."

In the light of these two decisions, it is manifest that at the time of the adoption of Oregon's Fair Trade Law, the provisions thereof respecting nonsigners were

in violation of the Sherman Antitrust Act and, therefore, were invalid and void.

The purpose of the McGuire Act was to overcome the objections to the fair trade laws as they applied to nonsigners, and as determined in the Schwegmann case. It is stated in the McGuire Act:

"It is the purpose of the Act to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons *who are not parties thereto*. (Italics ours.)

We note that in subd. (5) of § 5 (a) of the McGuire Act, the prohibitions of the Sherman Act against "contracts or agreements providing for the establishment of maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other," are retained.

Whether the McGuire Act, in the light of what Mr. Justice Douglas said in the Schwegmann case, actually accomplished its purpose, it is unnecessary for us to decide in the instant litigation.

However, from what has been said, it is obvious that at least until July 14, 1952, when the McGuire Act was adopted, there clearly was no valid law in this state which would bind nonsigners to these fair trade agreements.

Defendant challenges the constitutionality of our Fair Trade Law, as it applies to nonsigners, upon several grounds. Some of those grounds are:

■ That the statute exceeds the police power because there is no real or substantial relation between its price-fixing provisions and the public order, health, safety and welfare, and because it violates the natural rights inherent in the people, all in violation of the Preamble and Art 1, § 1, of the Oregon constitution.

2. That the statute is invalid in that it constitutes a delegation of legislative power to private persons in violation of Art 1, § 1, and Art IV, of the state constitution.

3. That the statute is unconstitutional in that it violates the due process clauses of both the Federal and state constitutions.

Although additional grounds of unconstitutionality are asserted against the Act, the foregoing constitute the principal contentions urged by defendant.

■ The law is well established that a court will not decide a case upon constitutional grounds unless absolutely necessary to a determination of the issue before it. If the decision can be based upon any other reasonable ground, such ground will be adopted, and the constitutional questions will be left open until a case is presented where a decision thereon becomes necessary. In *Elliott v. Oliver,* 22 Or 44, 48, 29 P 1, we quote with approval the following from Cooley's Const Lim:

"'In any case therefore,' says Judge Cooley, 'where a constitutional question is raised, though it may be legitimately presented by the record, yet if the record present some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, that course will be adopted and the

question of constitutional power will be left for consideration until a case arises which cannot be disposed of without considering it, and when consequently a decision upon such question will be unavoidable.' "

Also see *Oregon Cry. Mfrs. Ass'n. v. White,* 159 Or 99, 78 P2d 572; *Winslow v. Fleischner et al.,* 112 Or 23, 228 P 101, 34 ALR 826; *McKinney v. Watson,* 74 Or 220, 145 P 266; *State ex rel. v. Malheur County Court,* 46 Or 519, 81 P 368.

■ It also is well settled that where a statute is capable of two constructions, one of which would render it invalid and the other valid, the construction which will uphold its validity must be adopted by the court. In the *City of Portland v. Goodwin,* 187 Or 409, 416, 210 P2d 577, Mr. Justice BRAND, speaking for the court, said:

" * * * Many Oregon decisions support the following propositions: A statute is presumed to be supported by facts known to the legislative body, (Amer. F. of L. et al. v. Bain et al., 165 Or. 183, 106 P. 2d 544, 130 A.L.R. 1278) and is presumed to be constitutional. (Tompkins v. District Boundary Board, 180 Or. 339, 177 P. 2d 416; State v. Eaton et al., 119 Or. 613, 250 P. 233.) Courts will declare a statute invalid only if manifestly unreasonable and reasonableness is primarily a matter for the legislative judgment. (State v. Kincaid, 133 Or. 95, 285 P. 1105, 288 P. 1015.) Unconstitutionality must be established beyond reasonable doubt. (State v. Bailey, supra.) *If an enactment can be given any reasonable interpretation consistent with its validity, such interpretation should be adopted.* (Gantenbein v. West, 74 Or. 334, 144 P. 1171.) *A statute will he held inapplicable in certain cases when it would be unconstitutional if held applicable.* (Leonard v. Ekwall, 124 Or. 351, 264 P. 463.) *Where a statute is susceptible of two constructions, one of*

> *which would render it constitutional and the other
> unconstitutional, the courts will adopt the former.*
> (Fox v. Galloway, 174 Or. 339, 148 P. 2d 922.)''
> (Italics ours.)

With the foregoing rules in mind, we approach a consideration of the statute in the light of the facts present in this case.

At the outset, it should be pointed out that defendant maintains that inasmuch as the Oregon statute was invalid ab initio, as it applied to nonsigners, the adoption of the McGuire Act by Congress in 1952 could not and did not breathe the breath of life into this void enactment.

For the purposes of this case, we may assume but we do not decide, that the adoption of the McGuire Act, without any further action on the part of our own legislature, had the effect of giving life to the provisions of this state's Fair Trade Law as respects nonsigners, so as to make that law valid and effective on July 14, 1952. Under that assumption, it is manifest that the effect given our statute is the same as though it had been reenacted by the legislature and became effective on July 14, 1952. It could have no effect whatever prior to that date.

In the light of the concession we have made for the purposes of this case, the question is squarely presented whether the Act applies to the conduct of defendant, a nonsigner, who purchased the commodities in open market for resale at retail, at a time when no valid law or contract existed which in any way affected his right to resell the property at any price he saw fit.

Most if not all state courts which have upheld the validity of fair trade laws such as ours, as they applied to nonsigners, have relied and based their decisions

upon the authority of *Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.,* supra. As before observed, we did that: *The Borden Co. v. Schreder,* supra.

We must look, therefore, to :the Old Dearborn Distrib. Co. case to determine the basis of its holding that nonsigners were bound by the provisions of the statute. At page 191 of 299 US, the Supreme Court of the United States spoke as follows:

> "In respect of the due process of law clause, it is contended that the statute is a price-fixing law, which has the effect of denying to the owner of property the right to determine for himself the price at which he will sell. Appellants invoke the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property iself, and as such is within the protection of the Fifth and Fourteenth Amendments. Tyson & Brother v. Banton, 273 U.S. 418, 429; Wolff Co. v. Industrial Court, 262 U.S. 522, 537; Ribnik v. McBride, 277 U.S. 350; Williams v. Standard Oil Co., 278 U.S. 235; New State Ice Co. v. Liebmann, 285 U.S. 262. These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them. But the decisions referred to deal only with legislative price fixing. *They constitute no authority for holding that prices* in respect of 'identified' goods *may not be fixed under legislative leave by contract between the parties."* (Italics ours.)

After referring to § 1 of the Illinois Fair Trade Law (The same as the Oregon statute.), the court said:

> "* * * It *permits* the designated private persons to contract with respect thereto. It contains no element of compulsion but simply legalizes their acts, leaving them free to enter into the authorized

contract or not as they may see fit. Thus far, the act plainly is not open to objection; and none seems to be made.''

And then, at page 193 of 299 US, the court states the theory upon which it based its conclusion that a nonsigner was bound:

"Appellants here *acquired the commodity* in question with full knowledge of *the then-existing restriction in respect of price* which the producer and wholesale dealer had imposed, *and,* of course, *with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it,* upon every principle of fair dealing, *assent to the protective restriction,* with consequent liability under § 2 of the law by which such acquisition was conditioned.'' (Italics ours.)

In other words, the basis of the court's conclusion is that the nonsigner, by purchasing the goods with knowledge of the contract and the law applicable thereto, impliedly assented to the contract, and, by such implied assent, ratified and became a party to and was bound by the contract.

The important thing to note about the above holding is that the commodities involved in that litigation were purchased while a supposedly valid law, and also valid contracts, were in effect. It is obvious, therefore, that in the instant case the theory adopted by the United States Supreme Court in the Old Dearborn Distrib. Co. case as the basis for holding nonsigners liable does not apply.

The question under discussion is pinpointed in *Ely Lilly & Co. v. Saunders,* 216 NC 163, 4 SE2d 528, 125 ALR 1308, 1319. After calling attention to the due

process clause of the North Carolina constitution, the court said:.

> "It is contended that the statute delegates the power to fix the resale price on another's property, or directly or mediately fixes the price on a commodity at private sale with a like effect, in violation of this section. This is the objection repeatedly raised in the above cited cases under the similar provisions of the Federal Constitution. It has not received favorable consideration by the courts. Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra; Bourjois Sales Corp. v. Dorfman, supra; Pyroil Sales Co. v. Pep Boys, etc., supra.
>
> "*The restriction is not imposed after the acquisition of the property, and is not in derogation of an existing or established right.* Under the statute it was a condition that had already attached to the property. *It was known to the prospective purchaser, and he was under no obligation to assume it.* Morally and legally he is presumed to have accepted the condition by his voluntary act of purchase." (Italics ours.)

■ We now come to a direct consideration of the Fair Trade Law of this state as applied to the facts in this case. At the outset it should be stated that in all cases it is presumed that the legislative body intended to adopt a law that met constitutional demands. It is clear that if it were determined that the legislature, in enacting the Fair Trade Law, intended to make its provisions retroactive so as to apply to commodities acquired by a person prior to its effective date, grave doubts would arise as to the statute's constitutionality, as being in violation of the due process clauses of both federal and state constitutions. As stated by the court in *Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.,* supra: "* * * the right of the owner

of property to fix the price at which he will sell it is an inherent attribute of the property itself, * * *."

On the other hand, if it be determined that the legislature intended to make the Act applicable only to property acquired after the law became effective under conditions such as are outlined in the Old Dearborn Distrib. Co. case, supra, then (conceding for the purposes of this case the correctness of the conclusions reached by the United States Supreme Court in the Old Dearborn Distrib. Co. case) the enactment would not be invalid under the due process clauses.

■■ A review of the provisions of the Fair Trade Law of this state will disclose a clear intent on the part of the legislature to make the statute applicable to transactions in futuro; that its purpose was to govern sales of property purchased after its effective date. This construction of the statute is a reasonable construction, and, under the authorities above noted, it is our duty to adopt it.

The provisions of the Fair Trade Act do not apply to the property acquired by defendant. The trial court did not err in dismissing plaintiff's suit.

The decree is affirmed.